FILED

NOV 03 2014


CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA

---

AYANA HARDIMAN-DAVIS,

Plaintiff,

v.

HEALTH QUEST, INC. d/b/a Southridge Healthcare,

Defendant

**COMPLAINT**

Court File No. CIV14-4164

---

Plaintiff Ayana Hardiman-Davis, by and through her attorney Jack J. Nichols of Nichols & Rabuck, P.C., states the following as claims against Defendant Health Quest, Inc:

## NATURE OF THE ACTION

1. This is a race and national origin discrimination case involving a former employee of Health Quest, Inc., Defendant, at Defendant's Sioux Falls, South Dakota, location known as Southridge Healthcare.

2. Plaintiff seeks relief under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e-2, and SDCL § 20-13-10 as well as relief from Defendant's negligent conduct under the tort law of the State of South Dakota.

3. Plaintiff was subjected to a hostile environment wherein she was called racial slurs, harassed, and humiliated because Plaintiff is of African descent.

4. Defendant knew and had reason to know this type of conduct occurred and was occurring and took no steps to mitigate the hostile work environment.

5. Defendant had control over the persons whose conduct created the hostile work environment.

6. Defendant terminated Plaintiff as a result of an incident in which a racially charged comment was made to Plaintiff. The comment was made by a customer of Defendant over whom Defendant had substantial control. This particular customer had a history of threatening Defendant and this was well-known. On this occasion, Plaintiff told the customer that Plaintiff deserved to be spoken to respectfully. The customer complained to Defendant and Defendant terminated Plaintiff.

7. Following Plaintiff's termination, Defendant contacted the South Dakota Board of Nursing and accused Plaintiff of professional misconduct, an act which jeopardized Plaintiff's licensure and means of making a living. The South Dakota Board of Nursing promptly determined that the claim was unfounded and discontinued any further investigation.

8. Plaintiff suffered a great deal of emotional distress from the embarrassment she endured. This emotional distress was magnified by Defendant's complete lack of concern for her dignity.

## PARTIES

9. Ayana Hardiman-Davis ("Davis") is an LPN currently residing in Minnehaha County in the State of South Dakota. Davis is an African American.

10. Defendant operates a senior living facility called Southridge Healthcare located at 3600 S. Norton Avenue, Sioux Falls, SD 57105.

11.     Defendant's principal office is located at 1681 Granville Road, Cedarburg, Wisconsin 53012.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over the federal claims in this action pursuant to 28 U.S.C. § 1331 because they arise under 42 U.S.C. § 1981 and 42 U.S.C. § 2000e and duly enacted regulations in furtherance thereof.

13.     This Court has personal jurisdiction over the parties and is properly venued because substantially all of the events and facts described in the complaint took place in Sioux Falls, Minnehaha County, South Dakota.

14.     Plaintiff's attorney received a Notice of Right to Sue (Issued on Request) from the U.S. Equal Employment Opportunity Commission on August 7, 2014. It has not been more than ninety (90) days since that date. A true and correct copy of the Notice of Right to Sue is attached hereto as **Exhibit 'A'**.

15.     This Court has supplemental jurisdiction over the state claims of this action pursuant to 28 U.S.C. § 1367 because the unlawful actions underlying the claims are part of the same case or controversy as those over which the Court has original jurisdiction.

## FACTS

16.     Plaintiff began working for Defendant on or about January 23, 2013.

17.     Prior to Plaintiff's employment with Defendant, she had been a licensed practical nurse for over seven (7) years and had never been fired.

18. Within the first month of employment, residents of the facility began making racial comments to Plaintiff.

19. In March of 2013, the harassment grew worse as one resident, J.T. called Plaintiff a "nigger" and called the police on her. The police showed up to the facility. The event was very public and utterly humiliating. Defendant did nothing to mitigate the hostility for Plaintiff.

20. The Months of May through August of 2013 were particularly hostile. During this period Plaintiff was subjected to racial slurs or epithets on a weekly basis, and some were threatening in nature.

21. During this period of time, a resident L.B. threatened Plaintiff physically stating he was going to "kick [her] nigger ass… You nigger get away from me." This outburst was very public and was witnessed by several people. Again, Defendant did nothing.

22. During this period, on a date yet to be specifically determined, Plaintiff filed a formal grievance report with Defendant. This was ignored.

23. For most of her employment, Plaintiff was threatened by a resident T.C. on fairly frequent basis. T.C. would claim he was going to get Plaintiff fired, making comments such as "nigger, I'm going to get you fired."

24. Plaintiff filed at least two grievance reports directly with the director of nursing.

25. Other employees also filed grievance reports during this time.

26. The aforementioned events were recorded in patient longhand charts which were reviewed by Plaintiff's superiors.

27. The aforementioned events were recorded in the CareTracker observation recording system.

28. The aforementioned events were communicated verbally by Plaintiff to supervisors.

29. The aforementioned events were well-known around the facility.

30. Defendant ignored the conditions and failed to take any action.

31. Plaintiff had worked in other nursing homes where residents had, on occasion, made a racial comment.

32. In previous employment experiences where Plaintiff was the subject of harassment, Plaintiff's supervisors communicated to Plaintiff that she was a valuable employee and asset to the company. Sometimes this communication came from very high level management out of care for the dignity of their employees.

33. Plaintiff's previous employers would enforce a policy prohibiting derogatory racial language in their facility.

34. Plaintiff's previous employers would communicate directly with residents and/or their family in the event such rules against racially discriminatory language were violated.

35. Plaintiff's previous employers would take affirmative steps to assign other nurses to hostile residents.

36. In December of 2013, management contacted Plaintiff and scolded her about her attendance records. They scolded her about supposed incidents that happened back in September and October of 2013.

37. These attendance issues turned out to the result of inaccurate record-keeping.

38. Some of these attendance issues turned out to be the result of seizures suffered by Plaintiff as a result of a medical condition about which her supervisors knew.

39. Some of these attendance issues resulted from shift changes with another nurse who did not show up, but were nevertheless assessed to Plaintiff.

40. Some of these attendance issues were the result of Defendant having inadequate means of communication for employees to contact regarding ability to make it to a shift.

41. As part of the then in-place attendance policy, Plaintiff was supposed to receive credit for extra shifts or 30-day periods without being late. A true and correct copy of the relevant page of that attendance policy (with some unoriginal handwriting) is attached hereto as **Exhibit 'B'**.

42. Defendant regularly allowed other employees to be late or not show.

43. Defendant enforced its attendance policy inconsistently.

44. Defendant changed its attendance policy from a point system to a percentage-based system sometime after the alleged attendance issues of Plaintiff occurred, then attempted to justify their termination of Ayana based on a retroactive application of a new attendance policy.

45. On February 10, 2014, after Plaintiff changed resident T.C.'s feeding tube, he said "you people" are so lazy, referring to African Americans.

46. T.C. had previously made racial slurs to Plaintiff.

47. Plaintiff told T.C. that he needs to speak respectfully to her.

48. The EEOC encourages employees to take this action in their guidance: "Employees are encouraged to inform the harasser directly that the conduct is unwelcome and must stop. Employees should also report harassment to management at an early stage to prevent its escalation." A True and correct copy of this guidance bearing the U.S. Equal Employment Opportunity Commission official seal is attached hereto as **Exhibit 'C'**. This guidance is accessible on the EEOC website at http://www.eeoc.gov/laws/types/harassment.cfm.

49. When Plaintiff showed up for her next shift following this incident she was terminated.

50. Issues regarding Plaintiff's termination have been litigated in *In the Matter of Ayana Hardiman-Davis, Claimant, and Healthquest, Inc. Employer*, Decision Appeal No. 73742. This

decision is incorporated by reference. This reference is made strictly for purposes of establishing *res judicata* which may be waived under Federal Rules of Civil Procedure if not plead. Plaintiff does not waive its objection to the admission of evidence of collateral source of payment to a jury.

51. Plaintiff was terminated on the complaint of a resident known to be prejudice against and harass Plaintiff.

52. Defendant's siding with resident T.C. validated his harassing behavior towards Plaintiff.

53. Defendant's failure to address people under their care and control calling Plaintiff and other employees "niggers" is an adoption of a culture that is on its face hostile.

54. Being called a "nigger" while attempting to care for residents was dehumanizing to Plaintiff.

55. The complete disregard of Plaintiff's reports of such conduct by Plaintiff's supervisors was dehumanizing and humiliating to Plaintiff.

56. After terminating Plaintiff, Defendant wrongfully accused Plaintiff of professional misconduct.

57. Defendant reported Plaintiff to the South Dakota Board of Nursing for professional misconduct, but the investigation was quickly dismissed as the claims were unfounded.

## CAUSE OF ACTION I - HOSTILE WORK ENVIRONMENT

58. 42 U.S.C. § 1981 and § 2000e prohibit discrimination against citizens based on race and national origin, and specifically prohibit discrimination in the workforce.

59. SDCL §20-13-10 reads: "It is an unfair or discriminatory practice for any person, because of race, color, creed, religion, sex, ancestry, disability, or national origin, to fail or refuse to hire,

7

to discharge an employee, or to accord adverse or unequal treatment to any person or employee with respect to application, hiring, training, apprenticeship, tenure, promotion, upgrading, compensation, layoff, or any term or condition of employment."

60. Defendant maintained a hostile work environment.

61. Defendant accorded unequal treatment to Plaintiff.

62. The standard practice in the nursing home community is to have policies in place to address resident's discrimination and hostile treatment of their employees of a minority race or national origin.

63. This hostile work environment caused Defendant substantial pain and suffering, as well as an inability to perform her job the way a white/caucasian nurse would be able to.

## CAUSE OF ACTION II - WRONGFUL TERMINATION

64. Plaintiff was terminated because customers of Defendant did not like the color of her skin and national origin.

65. Plaintiff was terminated because the prejudicial treatment she received caused problems for Defendant. They would rather terminate a nurse who was going to be a problem because of the color of her skin than address the hostile work environment.

66. Plaintiff was terminated because she communicated to Defendant that she was being subjected to racial slurs.

67. Plaintiff has worked for multiple employers as a nurse for over seven (7) years and has never been terminated prior to her employment with Defendant.

68. Plaintiff was terminated because she informed a harasser (a customer of Defendant) that his conduct is unwelcome.

69. All the above reasons for termination are unlawful and discriminatory under both state and federal law.

70. Plaintiff's unlawful termination has caused her substantial unemployment, underemployment, pain, and suffering.

## CAUSE OF ACTION III - NEGLIGENCE

71. Defendant has a duty to maintain a safe work environment for employees.

72. Defendant failed to have any policy in place for discrimination of its employees by other employees, residents, or others over whom Defendant had control.

73. Defendant knew or should have known Plaintiff was being subjected to racial slurs and threats.

74. An employer acting with reasonable care under these circumstances would have investigated threats and racial slurs.

75. An employer acting with reasonable care under these circumstances would have a policy in place for threats and racial slurs.

76. An employer acting with reasonable care under these circumstances would take preventative measures to try to protect the dignity of diverse employees.

77. Because of Defendants failure to maintain a safe, non-hostile work environment, Plaintiff suffered damages including lost wages, pain and suffering, emotional distress, and other damages.

78. Plaintiffs injuries are a foreseeable result of Defendant's failure to adhere to the standard practices of similar employers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1. $22,320.00 in damages for lost wages;

2. $200,000.00 in damages for pain and suffering including emotional distress;

3. Attorneys fees;

4. An injunction requiring Defendant to adopt and enforce a written policy to address racial slurs made in its facilities and to train management on the same;

5. An injunction requiring Defendant to investigate claims by its employees when they are threatened and/or called racial slurs;

6. Punitive damages for the reckless disregard of Plaintiff's hostile treatment, her subsequent unlawful termination, and undue allegations to the board of nursing which jeopardized Plaintiff's career;

7. Pre and post-judgment interest; and

8. All other further relief the Court deems equitable and just.


Dated: November 3, 2014

NICHOLS & RABUCK, P.C.

/s/ Jack J. Nichols
Jack J. Nichols, # 4350
jack@nicholsrabuck.com
427 N. Minnesota Ave, Ste 101
Sioux Falls, SD 57104
605-332-6803


ATTORNEYS FOR PLAINTIFF